My name is Beverly Martin. Welcome to our courthouse here. I often remind my law clerks it belongs to you, so we like having you here. Judge Rosenbaum and I are delighted this morning to have Judge Martinez with us. You come, I think, fairly regularly, so we appreciate it when you help. The district judges have a full load without helping us do our work, so they take this on as extra work, and we really couldn't carry the load without them, so we appreciate you being here. Thank you very much. It's a pleasure to be here. All right. We're going to get underway. I think we have experienced counsel, so you are familiar with our lighting system. So we'll begin with the case of Advanced Masonry Associates v. the NLRB. Good morning, Your Honors. Good morning. Greg Hearing for the petitioner. I'd like to reserve three minutes. We're here today because this is an appeal of two National Labor Relations Board orders that essentially found that nine votes in a union election should be counted, and it tipped the scale. I'd like to, with your permission, break down my argument to first talking about Mr. Acevedo and Mr. Stevenson's termination, and then talking about the other seven masons on the Steny Daniel issue. So with Mr. Acevedo and Mr. Stevenson, our contention is that the Board did not have a violation of 8A1 and 3, and specifically, the Board relied on essentially three areas to find animus in its prima facie case. The first was that AMS opposed the union election, and as a matter of law and established Board law, AMS had a right to do that. And under the undisputed evidence in this record, AMS had a good relationship, prior relationship with this union. The undisputed evidence is that, in fact, the union representative testified it was a positive relationship, yet the Board found that there was animus just because the employer opposed it. The evidence also showed that three of the foremen, two of whom were involved in the actual termination investigation, were longtime union members and testified that they supported the union and paid union dues. The evidence also showed that this employer hired Mr. Acevedo twice, knowing that he was a union supporter and a union member. There was no evidence that showed that AMS violated the Act in opposing. In fact, again, case law says that you have the right to do so. Secondly, the timing was very important to the Board in its decision, as of course you've read. And we can't dispute that the timing was close. It was three weeks, but timing alone isn't enough. The case law says that you have to have shown that the employer had some prior resistance or past practice of opposing the union. And again, the evidence shows that other than saying we don't need a union and opposing the actual election, this employer actually worked well with, allowed the union to even come on the premises, which would have been a case in five years. You know, the hardest thing about your case is the burden, I mean, our standard of review, really. It is. I think our case law says that if the inferences that were drawn from the record are plausible, then we can't overturn what the Board does. I understand that. And Judge Rosenbaum was on a panel recently that said just that. I saw that and know that. However— But that's been our precedent for quite some time. And I understand, and I'm not saying it's recent, Judge, at all. I apologize if that's what— Oh, no, no, no. I just don't want you to blame my friend. No, no, of course not. I know that would be the end of me if I did anyway. Well, you know, I think— But picking up on what Judge Martin is saying, so maybe you could focus us on why you think that the conclusions, specifically why you think that the conclusions that were drawn by the Board are not plausible. Exactly. And that's, the first is, is that it's not plausible that there was any animus by the employer, just from the mere fact alone that they opposed the union, because the case law says you have the right to oppose the union. So that's implausible. The second, the timing. Timing, the case law says timing alone is not enough. So it's implausible just to hang animus on timing. The third thing, and this is where I think the Court, this Court, would look at closely, and, Your Honors, you do have the right in this case to look at credibility determinations. The law from this circuit in the Goya, NORB versus Goya case is that if it's implausible or, in the words of the Court, inherently unreasonable what somebody testified to, then you have the right to reverse the credibility determination. What happened here is the ALJ credited Mr. Acevedo's testimony that Mr. Feliz, the safety director, in a meeting with just Hispanic employees, said in Spanish that if the union comes in, wages will go down. And Mr. Luna also testified about Mr. Feliz's. He did testify, yes, Geraldo Luna, and Mr. Luna testified specifically in that regard that Mr. Feliz did not make any threats about wages. He said that the wages, people, I'm going to say exactly what it was because I wrote it down, what he testified to. He said that Mr. Feliz never made threats to employees and said nothing about offering extra wages for employees who would be with or not with the union. And again, Mr. Acevedo, I cross-examined him under the Jenks rule. He twice deviated from his affidavit. He admitted that he lied to AMS in the past about his physical injuries, claimed that he had not been hired because of physical injuries. He also admitted that he did not tell the truth on the morning of this fall protection violation that he said, well, I've never been trained on this orientation when he was showing the paperwork. Except that I thought what he said was I hadn't been trained on how to tie off the harness, not that I hadn't been trained at all, that I hadn't been trained in how to tie off the harness. And then after he was shown the orientation paperwork, he admitted that he did. Well, I thought he admitted that he had gone to the training, but then he said, but they didn't tell us how to tie off the harness. Maybe I'm misunderstanding, but that's, that was my recollection of the evidence. Well, again, my, I helped create the record. My recollection is that he testified that I did not get trained even how to tie it off with the harness or otherwise. And then when he was shown the orientation, which included that, he acknowledged that he did, in fact, get that training. But wouldn't that be a credibility question for the judge? I mean, for the judge to decide, and then the judge having decided that, unless there's some reason why it's not plausible that when he said, I didn't get trained, but I meant I didn't get trained on tying off the safety harness, why would we be able to set aside that conclusion? Because it's inherently unreasonable because he's not credible. In fact, he waffled many times in the record. Mr. Feliz did not. Mr. Luna supported Mr. Feliz's statement by saying that he did not say anybody, the wages go up or down with or without, but most importantly, with regard to Mr. Acevedo. Well, didn't, didn't Mr. Luna say something like that Mr. Feliz said that the union would be bad for, would be bad for them? No, actually, that, that is related to Mr. McNett, perhaps, that there was something that the ALJ actually noted, but then the board did not reach that in their conclusion of animus. But the, what I was going to say about Mr. Acevedo and the importance of this lying about the safety rule is that, again, he had obviously an interest here and it was inherently unreasonable in light of the fact that Mr. Feliz denied it. There's contemporaneous records that showed, in fact, he had been trained on it. I understand it's a tough burden with credibility, but your, the Goya case does say that you all can determine it was inherently unreasonable to reach that conclusion. If I may move. All right, there's, there's no question that we have the authority to do that. My questions go to what is your best evidence of why we should do that or what is your best argument? The best argument on there being no animus because, again, this gets into whether there was animus or not. This is one of the reasons why the board found animus is that Mr. Acevedo was known to be a member of the union, was hired twice. And Mr. Acevedo lied under oath multiple times. Mr. Feliz was not shown to lie under oath and there was contemporaneous documentation that supported the employer's reasons for terminating him. We also have multiple instances of enforcing this rule and the very best evidence in this case is that the same day, at the same time, under the same circumstances, Mr. Acevedo violated this rule and Mr. Stevenson did. Mr. Acevedo, a known member of the union, Mr. Stevenson did not. Except that our case law says that if, that somebody who's viewed as, quote, collateral damage, who's not a union member, doesn't really help your case. And, and I'm not saying that he was or he wasn't, but that is the position that, you know, the board reached. And why is that not credible? Because it's not, you know, why, why isn't there substantial evidence to support that? Why isn't it plausible? It's, it's not plausible because, in fact, if the, if the employer had a problem with the union but not without the union, they would have kept Mr. Stevenson, who is known not to be a supporter of it and not a dues paying. But there's, there's case law that says that when, when an employer gets rid of a non-employee, a non-union employee and a union employee simultaneously and there is reason to believe that the union employee was fired for the reason that he was associated with the union, then the fact that a non-union employee was fired at the same time is viewed more as collateral damage and is not, does not, does not demonstrate that the firing of the union employee was not related to the union. I mean, that's the case law that we're up against. So I need you to explain why that's not the case here, if you want us to rely on Mr. Stevenson's firing. Absolutely. And remember the facts of this case. They're very important. These are men working at elevated, if they fall, they die. And what the, the board would have us have to do under their theory in that case law then would be that we could take no action against either one of them and people could die. Well, I don't think. The board faced that, the argument that we did it, you know. I'm sorry. That's okay. That's not what I was understanding the board's position to be. My understanding of the board's position was that you certainly had the right to take action against them, but you couldn't take different action against them for the sole reason that one of them was a union member. Then you would take against other people who had engaged in the same violation. Right. Which is right. Okay. So, so I, if you wanted to maybe gear your argument towards why this action wasn't different than other action you had taken against other people who were not union employees, who had engaged in similar behavior, that might be helpful to me. Yes, sir. Or yes, your honor. Yes, ma'am. The, there's two other comparators that we put evidence on. Mr. Golfin and Mr. Leonardo. They were terminated one before, one after the RC petition. Same violation. Except, didn't they both have multiple violations? That's interesting. The board found it, wrote that in their order. That's true. But that AMS didn't cite them for multiple. They've cited them for the fall protection rule. And the board doesn't get to rewrite our, our business judgment or, or, or recast it, just like in employment cases. And so we had a prior history. We had a post history. And there was no testimony that when it was observed by an AMS employee that anybody survived violating that rule. I'm going to reserve the rest of my time to focus on any rebuttal if I can. Thank you for your questions, your honors. Thank you, counsel. Ms. Collins. May it please the court. My name is Valerie Collins and I represent the National Labor Relations Board. Because substantial evidence supports all of the board findings that are presently before the court, the board respectfully requests that both orders be enforced in full. I am going to begin with the 8A3 violations primarily because the 8A1 violations can be talked about in that framework, but also because if the court finds that the board did, that substantial evidence supports the board's findings on the discharge violations, it need not reach the other seven challenges in the 8A5 case. I would like to start very quickly about the right line framework that the board utilizes and this court utilizes because I think that a lot of the company's arguments are based on a misunderstanding of how that framework works. Before this court, the only issue is whether substantial evidence supports the board's findings that union activity was a motivating factor. Before the board, you have the right line kind of burden shifting test that the court is familiar with, where the general counsel has to establish that there's some type of connection. And in order to establish a connection between protected activity and adverse employment action, you can show, one, that there is some activity, two, that the employer is aware  Under animus, and we're still talking about the general counsel's initial burden here, animus can be shown by factors such as contemporaneous unfair labor practices, timing, pretextual reasons for the discharge. And here, we have all of that. But just before I jump into the facts, after the general counsel meets that burden, then the employer can rebut it and put on a case and say, we would have done the exact same thing even if there was no protected activity going on here. So a lot of the company's arguments about animus and timing kind of conflate the entire test. So absolutely, timing alone is sufficient to raise an inference of animus. But that's not the end of the case. Then the employer still has the opportunity to mount their defense and say, we would have done the exact same thing even if there was no animus here. Here, the board has several grounds that they rely upon animus. Just to clarify something that counsel said, the board absolutely did not rely on the company's anti-union campaign page. I believe it's three, footnote eight or nine, excuse me. The board actually explicitly states, yes, you can run an anti-union campaign, and we are not relying on that. So that, just in terms of a factual statement, is incorrect. What the board did rely upon are other violations of the act, notably the Section 8A1 unlawful threat that came from Feliz to the seven or eight Spanish-speaking Masons. I'd like to highlight the fact that while the company says that Luna said Feliz did not make a threat, the board did not use Luna's testimony as a finding of fact. The board used Luna's testimony because it directly contradicted Feliz's blanket denial that he never mentioned wages at all during that meeting. So just to highlight what exactly the board was using that testimony for, and there's really nothing in the record that would show that it's, that ALJ's credibility determination of Es Vedo is inherently unreasonable or based on inadequate reason. Of course it's based on adequate reason. I'd also challenge the statement that Es Vedo's had a stake here. Everybody has a stake here. I mean, these are employees who want their jobs back, and this is an employer who doesn't want them back. And, I mean, everyone has a stake. And that's why it's so important that courts can and do defer to these credibility determinations unless it's like just something outrageous or completely unreasonable. And there's nothing unreasonable about the ALJ's crediting of Es Vedo. Your colleague talks about Mr. Goffman and Mr. Leonardo and says that they are proper comparators and that the board improperly relied upon the fact that there were multiple violations since their paperwork did not reflect that that's why they were fired. I don't know if you might want to speak to that. That is 100 percent incorrect. For Goffman, if you look at the company's Exhibit 33, the reason given for his discharge, and I'm going to quote, fired, not tied off, and on telephone. For Leonardo, this is Company Exhibit 34, the reason given on the company's paperwork for his discharge was, and I'm going to quote again, not using fall protection and, quote, dismounting the scaffold, stepping on the braces because they didn't have access to the ladder to dismount. And that's Exhibit 34. So the company absolutely relied not just on the fall protection violation, but also these other violations that are pretty serious. The other comparators that the company submitted, those plainly just don't hold water. These are all people who were disciplined multiple times for the exact same policy violation. And even the argument that, oh, well, they were only disciplined and not fired for the first time is because general contractors witnessed the violation and not supervisors of the company. That's contradicted by the record evidence if you look at Comparator Timothy Bryant. Not only did a supervisor see his fall protection violation, the safety director was the one who witnessed this violation. He was not fired. He was- But apparently, I mean, the no-tolerance rule about the fall protection didn't make a distinction between whether the contractor saw it or- That's correct. It didn't. There's nothing about who sees what in terms of enforcing the policy. I'm going to move on to the Section 885 case, which is the rest of the challenges. As I mentioned earlier, if the court upholds the 883 violations, it need not reach the rest of the challenged voters. And that's because the vote was tied. And all of the challenged voters voted in favor of representation. And so any one of them, you know, the case could be over. Or put another way, the company will have to show that the board abused its discretion in each and every one of these nine challenged voters. I'd like to clarify, again, the kind of legal framework in this case as well, because I do think that there's a little confusion about what the board did. The Steine-Daniel formula is just that. It's a formula. There's math. There's numbers. You know, if you work this many number of days in this time period, then you are eligible to vote in the election. The policy reason behind the formula is you're eligible because you have a reasonable expectation of recall. So instead of the board, contrary to the company's argument, kind of inserting another prong or portion or expanding the formula, it did nothing of the sort. The board applied the formula. And because these people met the formula, they had a reasonable expectation of recall, and their vote should be counted. MS. WARREN. We also rarely have a chance to talk to people like you and your colleague who— MS. WARREN. I'm sorry? MS. WARREN. I also rarely have a chance to talk to people like you and your colleague who know this area of the law a lot better than I do. You mentioned the Steine-Daniel formula. MS. WARREN.   WARREN. I mean, how does the burden fall on that in that process? I mean, does the employee have the burden?  WARREN. Before the board, whoever's challenging the vote has the burden of showing that that potential voter is ineligible. In here, the board found that the company failed to make that showing. It failed to prove that these nine folks were ineligible to vote. And I'd like to highlight that—I guess I'll start with there's two voters that actually, in addition to Acevedo and Stevenson, who testified. And this is another finding here where the company's not—essentially, the attack is on the board's factual findings and the credibility determinations that support those factual findings. And here we have two employees who testified, and one said—or, excuse me, they both said, yeah, I was laid off. I did not voluntarily quit, and I was not fired for doing a bad job. That's a really, really high burden when you have that type of credibility-based determination. So for those alone, I mean, you have this in-person testimony that shows that the company didn't meet its burden. But you also have all of the paperwork here, which is pretty overwhelming in terms of how unreliable it is. And the argument that—or the position that the board is somehow required to credit, you know, documentation that's essentially all over the place is kind of wild. And the company has not even come close to showing that the credibility determinations that these folks were actually laid off and eligible to vote. The company simply has not been able to meet that burden. If the Court has no further questions, I see that I have more time. But we would respectfully request that the Court enforce both orders in full. And I appreciate the time for oral argument. Thank you, Ms. Collins. Thank you. To answer your question, Judge Martin, we agree that the burden would be on the employer to show that the ballots are ineligible. Thank you. I always use these opportunities to educate myself. So thank you. Understood. A couple things. I'm going to address directly what the board counsel said. Timing alone is enough. That's the NO—it's not enough. There's a case law right on point that says that you can't just have that. And that's the NORB v. Arkaman case, which is in our brief. With regard to the statement about Mr. Feliz, Mr. Feliz did not have a blanket denial. In fact, Mr. Feliz testified that he said that the market sets pay. That's what his testimony was. And it wasn't that he didn't blanket deny that he didn't talk about wages. When he was asked about wages, he said that he said the market sets the pay. And that's in the record. With regard to Mr. Bryant, just briefly about that, the—and the distinction of this general counsel or general contractor ruler is this. The evidence—and it was undisputed in the record—that AMS, if the general contractor witnessed a fault protection violation and said we want this discipline for it, they would concur with them. They're the general contractor. If AMS witnessed it, each and every person was terminated. In fact, those other three examples, that was the case when AMS observed it. There were some instances where the general contractor observed it first, didn't want termination, recommended suspension in training, and that's what AMS did. So that's the distinction. And I understand that that is an example of somebody that wasn't fired for a first violation, but the—and it wasn't written in the rule that it had to be observed. But that was—every bit of evidence in the record was a direct observation by AMS. Everybody got fired, including Mr. Acevedo and Mr. Stevenson. That's because of the liability and obviously the human toll that if these rules are not followed. In the last minute that I have, I'd like to point out just briefly, and I do agree that if you don't agree with us on Acevedo and Stevenson, you don't have to reach the other issues because then there are enough votes to tip the scale. But those two are very important to this petitioner because the board also ordered their reinstatement and back pay. And so that is a very—it's key for two reasons. Not only the Stein v. Daniel issue and whether you count them or not, but the actual 8A3 violation. And with regard to the others, though, being confident that you will agree with us that there wasn't substantial evidence to support the termination of Mr. Acevedo and Mr. Stevenson. Briefly, I will point out that while Smith and Wrench both said that they were laid off, it's not credible. Mr. Wrench acknowledged that there were 40 masons still there. The evidence was that we kept masons on this job until mid-June of 2016. Mr. Smith said, I was laid off with others but couldn't identify another. The contemporaneous record says that he was fired and that he was later rehired was something that the board pointed out as evidence. Well, that's not true. In fact, he was fired because he improperly put up a wall with 4-inch brick and then later he was hired to do 8-inch brick. The testimony was he was good at 8-inch brick but not the other. And I've exceeded my time. I appreciate that you guys, I'm sorry, I should never say that, that your honors have listened very carefully to our arguments. Thank you. We have and we found this argument very helpful, or at least I have. I have as well. Thank you. Thank you all. Thank you for coming. Thank you.